218 F.Supp.2d 611 (2002)
IN RE ALL MATTERS SUBMITTED TO THE FOREIGN INTELLIGENCE SURVEILLANCE COURT
No. MULTIPLE 02-429.
United States Foreign Intelligence Surveillance Court.
May 17, 2002.
*612 *613 James A. Baker, Counsel for Intelligence Policy (OIPR), Department of Justice, Washington, DC, David S. Kriss, Associate Deputy Attorney General, Department of Justice, Washington, DC, for movant.

MEMORANDUM OPINION (AS CORRECTED AND AMENDED)
LAMBERTH, Presiding Judge.

I
The Department of Justice has moved this Court to vacate the minimization and "wall" procedures in all cases now or ever before the Court, including this Court's adoption of the Attorney General's July 1995 intelligence sharing procedures, which are not consistent with new intelligence sharing procedures submitted for approval with this motion. The Court has considered the Government's motion, the revised intelligence sharing procedures, and the supporting memorandum of law as required by the Foreign Intelligence Surveillance Act (hereafter the FISA or the Act) at 50 U.S.C. § 1805(a)(4) and § 1824(a)(4) (hereafter omitting citations to 50 U.S.C.) to determine whether the proposed minimization procedures submitted with the Government's motion comport with the definition of minimization procedures under § 1801(h) and § 1821(4) of the Act. The Government's motion will be GRANTED, EXCEPT THAT THE PROCEDURES MUST BE MODIFIED IN PART.
The Court's analysis and findings are as follows:
JURISDICTION. Section 1803 of the FISA which established this Court provides that the Court "shall have jurisdiction to hear applications for and grant orders approving electronic surveillance anywhere within the United States under the procedures set forth in this Act." The comparable provision added when the FISA was amended to include physical searches appears in § 1822(c) entitled "Jurisdiction of Foreign Intelligence Surveillance Court," and says
The Foreign Intelligence Surveillance Court shall have jurisdiction to hear applications for and grant orders approving a physical search for the purpose of obtaining foreign intelligence information anywhere in the United States under the procedures set forth in this subchapter. (emphasis added)
Examination of the text of the statute leaves little doubt that the collection of foreign intelligence information is the raison d'etre for the FISA. Starting with its title, foreign intelligence information is the core of the Act:
 foreign intelligence information is defined in § 1801(e);
 minimization procedures to protect the privacy rights of Americans, defined in § 1801(h), and § 1821(4), must be reasonably designed and consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;
 section 1802(b) which authorizes the Government to file applications for electronic surveillance with this Court, empowers the judges of this Court to grant orders "approving electronic surveillance of a foreign power or agent of a foreign power for the purpose of obtaining foreign intelligence information." (emphasis added);
 applications for electronic surveillance and physical search must contain a certification from a senior Executive Branch official (normally the FBI Director in U.S. person cases) that "the information sought is foreign intelligence information," that "a significant purpose of the surveillance is to obtain foreign intelligence information," that "such [foreign *614 intelligence] information cannot reasonably be obtained by normal investigative techniques," and "designates the type of foreign intelligence information being sought." (§ 1804(a)(7)) Comparable requirements apply in applications for physical searches. (§ 1823(a)(7)).
 Applications for physical searches must contain a statement of the facts and circumstances relied on by the FBI affiant to justify his or her belief that the premises or property to be searched contains foreign intelligence information and a statement of the nature of the foreign intelligence information being sought. (§ 1823(a)(4)(B) and § 1823(a)(6)).
Additionally, the two Presidential Executive orders empowering the Attorney General to approve the filing of applications for electronic surveillances and physical searches, and granting the FBI Director and other senior executives the power to make the certifications required under the Act, specify "the purpose of obtaining foreign intelligence information." (emphasis added) (E.O. 12139, May 23, 1979, and E.O. 12949, February 9, 1995). Clearly this Court's jurisdiction is limited to granting orders for electronic surveillances and physical searches for the collection of foreign intelligence information under the standards and procedures prescribed in the Act[1].
SCOPE. Our findings regarding minimization apply only to communications of or concerning U.S. persons as defined in § 1801(i) of the act: U.S. citizens and permanent resident aliens whether or not they are the named targets in the electronic surveillances and physical searches. Conversely, this opinion does not apply to communications of foreign powers defined in § 1801(a), nor to non-U.S. persons.
METHODOLOGY. The analysis and findings in this opinion are based on traditional statutory construction of the FISA's provisions. The question before the Court involves straightforward application of the FISA as it pertains to minimization procedures, and raises no constitutional questions that need be decided. Discretion to evaluate proposed minimization procedures has been vested in the Court by the Congress expressly in the Act. (§ 1805(a)(4) and § 1824(a)(4)). The Court's determinations are grounded in the plain language of the FISA, and where applicable, in its legislative history. The statute requires the Court to make the necessary findings, to issue orders "as requested or modified," for electronic surveillances and physical searches, as well as to "assess compliance" with minimization procedures for information concerning U.S. persons. (§ 1805 and § 1824 of the Act).
CONSIDERATION OF THE ISSUE. Prior to May of 1979, when the FISA became operational, it was not uncommon for courts to defer to the expertise of the Executive Branch in matters of foreign intelligence collection. Since May 1979, this Court has often recognized the expertise of the government in foreign intelligence collection and counterintelligence investigations of espionage and international terrorism, and accorded great weight to the government's interpretation of FISA's standards. However, this Court, or on appeal the Foreign Intelligence Surveillance *615 Court of Review having jurisdiction "to review the denial of any application," is the arbiter of the FISA's terms and requirements. (§ 1803(b)) The present seven members of the Court have reviewed and approved several thousand FISA applications, including many hundreds of surveillances and searches of U.S. persons. The members bring their specialized knowledge to the issue at hand, mindful of the FISA's preeminent role in preserving our national security, not only in the present national emergency, but for the long term as a constitutional democracy under the rule of law.

II
We turn now to the government's proposed minimization procedures which are to be followed in all electronic surveillances and physical searches past, present, and future. In addition to the Standard Minimization Procedures for a U.S. Person Agent of a Foreign Power that are filed with the Court, which we continue to approve, the government has submitted new supplementary minimization procedures adopted by the Attorney General and promulgated in the form of a memorandum addressed to the Director of the FBI and other senior Justice Department executives and dated March 6, 2002. (hereafter the Attorney General's memorandum or the 2002 procedures). The Attorney General's memorandum is divided into three sections entitled:
"I. INTRODUCTION AND STATEMENT OF GENERAL PRINCIPLES,"[2]
"II. INTELLIGENCE SHARING PROCEDURES CONCERNING THE CRIMINAL DIVISION," AND "III. INTELLIGENCE SHARING PROCEDURES CONCERNING A USAO."
The focus of this decision is sections II and III which set out supplementary procedures affecting the acquisition, retention, and dissemination of information obtained through electronic surveillances and physical searches of U.S. persons to be approved as part of the government's applications and incorporated in the orders of this Court.
Our duty regarding approval of these minimization procedures is inscribed in the Act, as is the standard we must follow in our decision making. Where Congress has enacted a statute like the FISA, and defined its terms, we are bound to follow those definitions. We cannot add to, subtract from, or modify the words used by Congress, but must apply the FISA's provisions with fidelity to their plain meaning and in conformity with the overall statutory scheme. The FISA is a statute of unique character, intended to authorize electronic surveillances and physical searches of foreign powers and their agents, including U.S. persons. "Further, as a statute addressed entirely to `specialists,' it must, as Mr. Justice Frankfurter observed, `be read by judges with the minds of * * * specialists'."[3]
The Attorney General's new minimization procedures are designed to regulate the acquisition, retention, and dissemination *616 of information involving the FISA (i.e., disseminating information, consulting, and providing advice) between FBI counterintelligence and counter-terrorism officials on the one hand, and FBI criminal investigators, trial attorneys in the Justice Department's Criminal Division, and U.S. Attorney's Offices on the other hand. These new minimization procedures supersede similar procedures issued by the Attorney General in July 1995 (hereafter the 1995 procedures) which were augmented in January 2000, and then in August 2001 by the current Deputy Attorney General. The Court has relied on the 1995 procedures, which have been followed by the FBI and the Justice Department in all electronic surveillances and physical searches of U.S. persons since their promulgation in July 1995. In November 2001, the court formally adopted the 1995 procedures, as augmented, as minimization procedures defined in § 1801(h) and § 1821(4), and has incorporated them in all applicable orders and warrants granted since then.
The 2002 procedures have been submitted to the Court pursuant to § 1804(a)(5) and § 1823(a)(5) to supplement the Standard Minimization Procedures for U.S. Person Agents of Foreign Powers. Both sets of procedures are to be applied in past and future electronic surveillances and physical searches subject to the approval of this Court. Pursuant to § 1805(a) and § 1824(a) the Court has carefully considered the 2002 intelligence sharing procedures. The Court finds that these procedures 1) have been adopted by the Attorney General; 2) are designed to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons, and 3) are, therefore, minimization procedures as defined in § 1801(h) and § 1821(4).
The standard we apply in these findings is mandated in § 1805(a)(4) and § 1824(a)(4), which state that "the proposed minimization procedures meet the definition of minimization procedures under § 101(h), [§ 1801(h) and § 1821(4)] of the Act." The operative language of each section to be applied by the Court provides that minimization procedures must be reasonably designed in light of their purpose and technique, and mean 
specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, [search] to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.
§ 1801(h)(1) and § 1821(4)(A).
Thus in approving minimization procedures the Court is to ensure that the intrusiveness of foreign intelligence surveillances and searches on the privacy of U.S. persons is "consistent" with the need of the United States to collect foreign intelligence information from foreign powers and their agents.
Our deliberations begin with an examination of the first part of § 1801(h) and § 1821(4) involving the acquisition, retention and dissemination of U.S. person information. Most of the rules and procedures for minimization are set forth in the Standard Minimization Procedures which will continue to be applied along with the 2002 procedures, and permit exceptionally thorough acquisition and collection through a broad array of contemporaneous electronic surveillance techniques. Thus, in many U.S. person electronic surveillances the FBI will be authorized to conduct, simultaneously, telephone, microphone, cell phone, e-mail and computer *617 surveillance of the U.S. person target's home, workplace and vehicles. Similar breadth is accorded the FBI in physical searches of the target's residence, office, vehicles, computer, safe deposit box and U.S. mails where supported by probable cause. The breadth of acquisition is premised on the fact that clandestine intelligence activities and activities in preparation for international terrorism are undertaken with considerable direction and support from sophisticated intelligence services of nation states and well-financed groups engaged in international terrorism.
The intrusiveness of the FBI's electronic surveillances and sophisticated searches and seizures is sanctioned by the following practices and provisions in the FISA:
 a foreign intelligence standard of probable cause instead of the more traditional criminal standard of probable cause;
 having to show only that the place or facility to be surveilled or searched is being used or about to be used without the need of showing that it is being used in furtherance of the espionage or terrorist activities;
 surveillances and searches are conducted surreptitiously without notice to the target unless they are prosecuted;
 surveillances and now searches are authorized for 90 days, and may continue for as long as one year or more in certain cases;
 large amounts of information are collected by automatic recording to be minimized after the fact;
 most information intercepted or seized has a dual character as both foreign intelligence information and evidence of crime (e.g., the identity of a spy's handler, his/her communication signals and deaddrop locations; the fact that a terrorist is taking flying lessons, or purchasing explosive chemicals) differentiated primarily by the persons using the information;[4]
 when facing criminal prosecution, a target cannot obtain discovery of the FISA applications and affidavits supporting the Court's orders in order to challenge them because the FISA mandates in camera, ex parte review by the district court "if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security." § 1806(f) and § 1825(g)
It is self evident that the technical and surreptitious means available for acquisition of information by electronic surveillances and physical searches, coupled with the scope and duration of such intrusions and other practices under the FISA, give the government a powerful engine for the collection of foreign intelligence information targeting U.S. persons.
Retention under the standard minimization procedures is also heavily weighted toward the government's need for foreign intelligence information. Virtually all information seized, whether by electronic surveillance or physical search, is minimized hours, days, or weeks after collection. The principal steps in the minimization process are the same for electronic surveillances and physical searches:
 information is reduced to an intelligible form: if recorded it is transcribed, if in a foreign language it is translated, if *618 in electronic or computer storage it is accessed and printed, if in code it is decrypted and if on film or similar media it is developed and printed;
 once the information is understandable, a reviewing official, usually an FBI case agent, makes an informed judgment as to whether the information seized is or might be foreign intelligence information related to clandestine intelligence activities or international terrorism;
 if the information is determined to be, or might be, foreign intelligence, it is logged into the FBI's records and filed in a variety of storage systems from which it can be retrieved for analysis, for counterintelligence investigations or operations, or for use at criminal trial;
 if found not to be foreign intelligence information, it must be minimized, which can be done in variety of ways depending upon the format of the information: if recorded the information would not be indexed, and thus become non-retrievable, if in hard copy from facsimile intercept or computer print-out it should be discarded, if on re-recordable media it could be erased, or if too bulky or too sensitive, it might be destroyed.
These same principles of minimization are applied to all information collected, whether by electronic surveillance or physical search. The most critical step in retention is the analysis in which an informed judgment is made as to whether or not the communications or other data seized is foreign intelligence information. To guide FBI personnel in this determination the Standard Minimization Procedures for U.S. Person Agent of a Foreign Power in Section 3.(a)(4) Acquisition/Interception/Monitoring and Logging provide that "communications of or concerning United States persons that could not be foreign intelligence information or are not evidence of a crime . . . may not be logged or summarized." (emphasis added). Minimization is required only if the information "could not be" foreign intelligence. Thus, it is obvious that the standard for retention of FISAacquired information is weighted heavily in favor of the government.
This brings us to the third and perhaps most complex part of minimization practice, the dissemination and use of FISA  acquired information. Recognizing the broad sweep of acquisition allowed under FISA's definition of electronic surveillance (and, subsequently, physical searches), coupled with the low threshold for retention in the "could not be foreign intelligence" standard, Congress has provided guidance for the Court in the FISA's legislative history:
On the other hand, given this degree of latitude the committee believes it is imperative that with respect to information concerning U.S. persons which is retained as necessary for counterintelligence or counter terrorism purposes, rigorous and strict controls be placed on the retrieval of such identifiable information and its dissemination or use for purposes other than counterintelligence or counter terrorism. (emphasis added)[5] The judge has the discretionary power to modify the order sought, such as with regard to the period of authorization . . . or the minimization procedures to be followed. (emphasis added)[6] The Committee contemplates that the court would give these procedures most careful consideration. If it is not of the opinion that they will be effective, the procedures should be modified. (emphasis added)[7]
*619 Between 1979 when the FISA became operational and 1995, the government relied on the standard minimization procedures described herein to regulate all electronic surveillances. In 1995, following amendment of the FISA to permit physical searches, comparable minimization procedures were adopted for foreign intelligence searches. On July 19, 1995, the Attorney General issued Procedures for Contacts Between the FBI and Criminal Division Concerning FI and Foreign Counterintelligence Investigations, which in part A regulated "Contacts During an FI or FCI Investigation in Which FISA Surveillance or Searches are Being Conducted" between FBI personnel and trial attorneys of the Department's Criminal Division. The Court was duly informed of these procedures and has considered them an integral part of the minimization process although they were not formally submitted to the Court under § 1804(a)(5) or § 1823(a)(5). In January, 2000 the Attorney General augmented the 1995 procedures to permit more information sharing from FISA cases with the Criminal Division, and the current Deputy Attorney General expanded the procedures in August 2001. Taken together, the 1995 procedures, as augmented, permit substantial consultation and coordination as follows:
a. reasonable indications of significant federal crimes in FISA cases are to be reported to the Criminal Division of the Department of Justice;
b. The Criminal Division may then consult with the FBI and give guidance to the FBI aimed at preserving the option of criminal prosecution, but may not direct or control the FISA investigation toward law enforcement objectives;
c. the Criminal Division may consult further with the appropriate U.S. Attorney's Office about such FISA cases;
d. on a monthly basis senior officials of the FBI provide briefings to senior officials of the Justice Department, including OIPR and the Criminal Division, about intelligence cases, including those in which FISA is or may be used;
e. all FBI 90-day interim reports and annual reports of counterintelligence investigations, including FISA cases, are being provided to the Criminal Division, and must now contain a section explicitly identifying any possible federal criminal violations;
f. all requests for initiation or renewal of FISA authority must now contain a section devoted explicitly to identifying any possible federal criminal violations;

g. the FBI is to provide monthly briefings directly to the Criminal Division concerning all counterintelligence investigations in which there is a reasonable indication of a significant federal crime;
h. prior to each briefing the Criminal Division is to identify (from FBI reports) those intelligence investigations about which it requires additional information and the FBI is to provide the information requested; and
i. since September 11, 2001, the requirement that OIPR be present at all meetings and discussions between the FBI and Criminal Division involving certain FISA cases has been suspended; instead, OIPR reviews a daily briefing book to inform itself and this Court about those discussions.
The Court came to rely on these supplementary procedures, and approved their broad information sharing and coordination with the Criminal Division in thousands of applications. In addition, because of the FISA's requirement (since amended) that the FBI Director certify that "the *620 purpose" of each surveillance and search was to collect foreign intelligence information, the Court was routinely apprised of consultations and discussions between the FBI, the Criminal Division, and U.S. Attorney's offices in cases where there were overlapping intelligence and criminal investigations or interests. This process increased dramatically in numerous FISA applications concerning the September 11th attack on the World Trade Center and the Pentagon.
In order to preserve both the appearance and the fact that FISA surveillances and searches were not being used sub rosa for criminal investigations, the Court routinely approved the use of information screening "walls" proposed by the government in its applications. Under the normal "wall" procedures, where there were separate intelligence and criminal investigations, or a single counter-espionage investigation with overlapping intelligence and criminal interests, FBI criminal investigators and Department prosecutors were not allowed to review all of the raw FISA intercepts or seized materials lest they become defacto partners in the FISA surveillances and searches. Instead, a screening mechanism, or person, usually the chief legal counsel in an FBI field office, or an assistant U.S. attorney not involved in the overlapping criminal investigation, would review all of the raw intercepts and seized materials and pass on only that information which might be relevant evidence. In unusual cases such as where attorney-client intercepts occurred, Justice Department lawyers in OIPR acted as the "wall." In significant cases, involving major complex investigations such as the bombings of the U.S. Embassies in Africa, and the millennium investigations, where criminal investigations of FISA targets were being conducted concurrently, and prosecution was likely, this Court became the "wall" so that FISA information could not be disseminated to criminal prosecutors without the Court's approval. In some cases where this Court was the "wall," the procedures seemed to have functioned as provided in the Court's orders; however, in an alarming number of instances, there have been troubling results.
Beginning in March 2000, the government notified the Court that there had been disseminations of FISA information to criminal squads in the FBI's New York field office, and to the U.S. Attorney's Office for the Southern District of New York, without the required authorization of the Court as the "wall" in four or five FISA cases. Subsequently, the government filed a notice with the Court about it's unauthorized disseminations.
In September 2000, the government came forward to confess error in some 75 FISA applications related to major terrorist attacks directed against the United States. The errors related to misstatements and omissions of material facts, including:
a. an erroneous statement in the FBI Director's FISA certification that the target of the FISA was not under criminal investigation;
b. erroneous statements in the FISA affidavits of FBI agents concerning the separation of the overlapping intelligence and criminal investigations, and the unauthorized sharing of FISA information with FBI criminal investigators and assistant U.S. attorneys;
c. omissions of material facts from FBI FISA affidavits relating to a prior relationship between the FBI and a FISA target, and the interview of a FISA target by an assistant U.S. attorney.
In November of 2000, the Court held a special meeting to consider the troubling number of inaccurate FBI affidavits in so many FISA applications. After receiving *621 a more detailed explanation from the Department of Justice about what went wrong, but not why, the Court decided not to accept inaccurate affidavits from FBI agents whether or not intentionally false. One FBI agent was barred from appearing before the Court as a FISA affiant. The Court decided to await the results of the investigation by the Justice Department's Office of Professional Responsibility before taking further action.
In March of 2001, the government reported similar misstatements in another series of FISA applications in which there was supposedly a "wall" between separate intelligence and criminal squads in FBI field offices to screen FISA intercepts, when in fact all of the FBI agents were on the same squad and all of the screening was done by the one supervisor overseeing both investigations.
To come to grips with this problem, in April of 2001, the FBI promulgated detailed procedures governing the submission of requests to conduct FISA surveillances and searches, and to review draft affidavits in FISA applications, to ensure their accuracy. These procedures are currently in use and require careful review of draft affidavits by the FBI agents in the field offices who are conducting the FISA case investigations, as well as the supervising agents at FBI headquarters who appear before the Court and swear to the affidavits.
In virtually every instance, the government's misstatements and omissions in FISA applications and violations of the Court's orders involved information sharing and unauthorized disseminations to criminal investigators and prosecutors. These incidents have been under investigation by the FBI's and the Justice Department's Offices of Professional Responsibility for more than one year to determine how the violations occurred in the field offices, and how the misinformation found its way into the FISA applications and remained uncorrected for more than one year despite procedures to verify the accuracy of FISA pleadings. As of this date, no report has been published, and how these misrepresentations occurred remains unexplained to the Court.
As a consequence of the violations of its orders, the Court has taken some supervisory actions to assess compliance with the "wall" procedures. First, until September 15, 2001 it required all Justice Department personnel who received certain FISA information to certify that they understood that under "wall" procedures FISA information was not to be shared with criminal prosecutors without the Court's approval. Since then, the Court has authorized criminal division trial attorneys to review all FBI international terrorism case files, including FISA case files and required reports from FBI personnel and Criminal Division attorneys describing their discussions of the FISA cases. The government's motion that the Court rescind all "wall" procedures in all international terrorism surveillances and searches now pending before the Court, or that has been before the Court at any time in the past, was deferred by the Court until now, at the suggestion of the government, pending resolution of this matter.
Given this history in FISA information sharing, the Court now turns to the revised 2002 minimization procedures. We recite this history to make clear that the Court has long approved, under controlled circumstances, the sharing of FISA information with criminal prosecutors, as well as consultations between intelligence and criminal investigations where FISA surveillances and searches are being conducted. However, the proposed 2002 minimization procedures eliminate the bright line in the 1995 procedures prohibiting direction and control by prosecutors on *622 which the Court has relied to moderate the broad acquisition retention, and dissemination of FISA information in overlapping intelligence and criminal investigations. Paragraph A.6. of the 1995 procedures provided in part:
Additionally, the FBI and the Criminal Division should ensure that advice intended to preserve the option of a criminal prosecution does not inadvertently result in either the fact or the appearance of the Criminal Division's directing or controlling the FI or FCI investigation toward law enforcement objectives. (emphasis added)
As we conclude the first part of our statutory task, we have determined that the extensive acquisition of information concerning U.S. persons through secretive surveillances and searches authorized under FISA, coupled with broad powers of retention and information sharing with criminal prosecutors, weigh heavily on one side of the scale which we must balance to ensure that the proposed minimization procedures are "consistent" with the need of the United States to obtain, produce, and disseminate foreign intelligence information. (§ 1805(a)(4) and § 1824(a)(4))

III
The 2002 minimization rules set out in sections II and III, "Intelligence Sharing Procedures Concerning the Criminal Division" and "Intelligence Sharing Procedures Concerning a USAO," continue the existing practice approved by this Court of in-depth dissemination of FISA information to Criminal Division trial attorneys and U.S. Attorney's Offices (hereafter criminal prosecutors). These new procedures apply in two kinds of counterintelligence cases in which FISA is the only effective tool available to both counterintelligence and criminal investigators:
1) those cases in which separate intelligence and criminal investigations of the same U.S. person FISA target are conducted by different FBI agents (overlapping investigations), usually involving international terrorism, and in which separation can easily be maintained, and
2) those cases in which one investigation having a U.S. person FISA target is conducted by a team of FBI agents which has both intelligence and criminal interests (overlapping interests) usually involving espionage and similar crimes in which separation is impractical.
In both kinds of counterintelligence investigations where FISA is being used, the proposed 2002 minimization procedures authorize extensive consultations between the FBI and criminal prosecutors "to coordinate efforts to investigate or protect against" actual or potential attack, sabotage, international terrorism and clandestine intelligence activities by foreign powers and their agents as now expressly provided in § 1806(k)(1) and § 1825(k)(1). These consultations propose to include:
II. A. "Disseminating Information," which gives criminal prosecutors access to "all information developed" in FBI counterintelligence investigations, including FISA acquired information, as well as annual and other reports, and presumably ad hoc reporting of significant events (e.g., incriminating FISA intercepts or seizures) to criminal prosecutors.
II. B. "Providing Advice," where criminal prosecutors are authorized to consult extensively and provide advice and recommendations to intelligence officials about "all issues necessary to the ability of the United States to investigate or protect against foreign attack, sabotage, terrorism, and clandestine intelligence activities." Recommendations may include advice about criminal investigation and prosecution as well as the strategy and goals for investigations, the law enforcement and intelligence methods to be used in investigations, *623 and the interaction between intelligence and law enforcement components of investigations.
Last, but most relevant to this Court's finding, criminal prosecutors are empowered to advise FBI intelligence officials concerning "the initiation, operation, continuation, or expansion of FISA searches or surveillance." (emphasis added) This provision is designed to use this Court's orders to enhance criminal investigation and prosecution, consistent with the government's interpretation of the recent amendments that FISA may now be "used primarily for a law enforcement purpose."
In section III, "Intelligence Sharing Procedures Concerning a USAO," U.S. attorneys are empowered to "engage in consultations to the same extent as the Criminal Division under parts II. A and II. B of these procedures," in cases involving international terrorism.
A fair reading of these provisions leaves only one conclusion  under sections II and III of the 2002 minimization procedures, criminal prosecutors are to have a significant role directing FISA surveillances and searches from start to finish in counterintelligence cases having overlapping intelligence and criminal investigations or interests, guiding them to criminal prosecution. The government makes no secret of this policy, asserting its interpretation of the Act's new amendments which "allows FISA to be used primarily for a law enforcement purpose."
Given our experience in FISA surveillances and searches, we find that these provisions in sections II.B and III, particularly those which authorize criminal prosecutors to advise FBI intelligence officials on the initiation, operation, continuation or expansion of FISA's intrusive seizures, are designed to enhance the acquisition, retention and dissemination of evidence for law enforcement purposes, instead of being consistent with the need of the United States to "obtain, produce, and disseminate foreign intelligence information" (emphasis added) as mandated in § 1801(h) and § 1821(4). The 2002 procedures appear to be designed to amend the law and substitute the FISA for Title III electronic surveillances and Rule 41 searches. This may be because the government is unable to meet the substantive requirements of these law enforcement tools, or because their administrative burdens are too onerous. In either case, the FISA's definition of minimization procedures has not changed, and these procedures cannot be used by the government to amend the Act in ways Congress has not. We also find the provisions in section II.B and III. wanting because the prohibition in the 1995 procedures of criminal prosecutors "directing or controlling" FISA cases has been revoked by the proposed 2002 procedures. The government's memorandum of law expends considerable effort justifying deletion of that bright line, but the Court is not persuaded.
The Court has long accepted and approved minimization procedures authorizing in-depth information sharing and coordination with criminal prosecutors as described in detail above. In the Court's view, the plain meaning of consultations and coordination now specifically authorized in the Act is based on the need to adjust or bring into alignment two different but complementary interests  intelligence gathering and law enforcement. . In FISA cases this presupposes separate intelligence and criminal investigations, or a single investigation with intertwined interests, which need to be brought into harmony to avoid dysfunction and frustration of either interest. If criminal prosecutors direct both the intelligence and criminal investigations, or a single investigation having combined interests, coordination becomes subordination of both investigations or interests to law enforcement *624 objectives. The proposed 2002 minimization procedures require the Court to balance the government's use of FISA surveillances and searches against the government's need to obtain and use evidence for criminal prosecution, instead of determining the "need of the United States to obtain, produce, and disseminate foreign intelligence information" as mandated by § 1801(h) and § 1821(4).
Advising FBI intelligence officials on the initiation, operation, continuation or expansion of FISA surveillances and searches of U.S. persons means that criminal prosecutors will tell the FBI when to use FISA (perhaps when they lack probable cause for a Title III electronic surveillance), what techniques to use, what information to look for, what information to keep as evidence and when use of FISA can cease because there is enough evidence to arrest and prosecute. The 2002 minimization procedures give the Department's criminal prosecutors every legal advantage conceived by Congress to be used by U.S. intelligence agencies to collect foreign intelligence information, including:
 a foreign intelligence standard instead of a criminal standard of probable cause;
 use of the most advanced and highly intrusive techniques for intelligence gathering; and
 surveillances and searches for extensive periods of time;
based on a standard that the U.S. person is only using or about to use the places to be surveilled and searched, without any notice to the target unless arrested and prosecuted, and, if prosecuted, no adversarial discovery of the FISA applications and warrants. All of this may be done by use of procedures intended to minimize collection of U.S. person information, consistent with the need of the United States to obtain and produce foreign intelligence information. If direction of counterintelligence cases involving the use of highly intrusive FISA surveillances and searches by criminal prosecutors is necessary to obtain and produce foreign intelligence information, it is yet to be explained to the Court.
THEREFORE, because
 the procedures implemented by the Attorney General govern the minimization of electronic surveillances and searches of U.S. persons;
 such intelligence and criminal investigations both target the same U.S. person;
 the information collected through FISA surveillances and searches is both foreign intelligence information and evidence of crime, depending upon who is using it;
 there are pervasive and invasive techniques for electronic surveillances and physical searches authorized under the FISA;
 surveillances and searches may be authorized for extensive periods of time;
 notice of surveillances and searches is not given to the targets unless they are prosecuted;
 the provisions in FISA constrain discovery and adversary hearings and require ex parte, in camera review of FISA surveillances and searches at criminal trial;
 the FISA, as opposed to Title III and Rule 41 searches, is the only tool readily available in these overlapping intelligence and criminal investigation;
 there are extensive provisions in the minimization procedures for dissemination of FISA intercepts and seizures to criminal prosecutors and for consultation and coordination with intelligence officials using the FISA;
 criminal prosecutors would, under the proposed procedures, no longer be prohibited from "directing or controlling" *625 counterintelligence investigations involving use of the FISA toward law enforcement objectives; and
 criminal prosecutors would, under the proposed procedures, be empowered to direct the use of FISA surveillances and searches toward law enforcement objectives by advising FBI intelligence officials on the initiation, operation, continuation and expansion of FISA authority from this Court,
The Court FINDS that parts of section II.B of the minimization procedures submitted with the Government's motion are NOT reasonably designed, in light of their purpose and technique, "consistent with the need of the United States to obtain, produce, or disseminate foreign intelligence information" as defined in § 1801(h) and § 1821(4) of the Act.
THEREFORE, pursuant to this Court's authority under § 1805(a) and § 1824(a) to issue ex parte orders for electronic surveillances and physical searches "as requested or as modified," the Court herewith grants the Governments motion BUT MODIFIES the pertinent provisions of sections II. B. of the proposed minimization procedures as follows:
The second and third paragraphs of section II.B shall be deleted, and the following paragraphs substituted in place thereof:
"The FBI, the Criminal Division, and OIPR may consult with each other to coordinate their efforts to investigate or protect against foreign attack or other grave hostile acts, sabotage, international terrorism or clandestine intelligence activities by foreign powers or their agents. Such consultations and coordination may address, among other things, exchanging information already acquired, identifying categories of information needed and being sought, preventing either investigation or interest from obstructing or hindering the other, compromise of either investigation, and long term objectives and overall strategy of both investigations in order to ensure that the overlapping intelligence and criminal interests of the United States are both achieved. Such consultations and coordination may be conducted directly between the components, however, OIPR shall be invited to all such consultations, and if they are unable to attend, OIPR shall be apprised of the substance of the consultations forthwith in writing so that the Court may be notified at the earliest opportunity."
"Notwithstanding the foregoing, law enforcement officials shall not make recommendations to intelligence officials concerning the initiation, operation, continuation or expansion of FISA searches or surveillances. Additionally, the FBI and the Criminal Division shall ensure that law enforcement officials do not direct or control the use of the FISA procedures to enhance criminal prosecution, and that advice intended to preserve the option of a criminal prosecution does not inadvertently result in the Criminal Division's directing or controlling the investigation using FISA searches and surveillances toward law enforcement objectives."
These modifications are intended to bring the minimization procedures into accord with the language used in the FISA, and reinstate the bright line used in the 1995 procedures, on which the Court has relied. The purpose of minimization procedures as defined in the Act, is not to amend the statute, but to protect the privacy of Americans in these highly intrusive surveillances and searches, "consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information."
A separate order shall issue this date.
All seven judges of the Court concur in the Corrected and Amended Memorandum Opinion.


*626 ORDER (AS AMENDED)
Motion having been made by the United States of America, by James A. Baker, Counsel for Intelligence Policy, United States Department of Justice, for the Court to approve proposed minimization procedures entitled Intelligence Sharing Procedures for Foreign Intelligence and Foreign Counterintelligence Investigations Conducted by the FBI, to be used in electronic surveillances and physical searches authorized by this Court, as well as a supporting memorandum of law, and a supplemental memorandum, which filing was approved by the Attorney General of the United States, and full consideration having been given to the matters set forth therein, the Court finds:
1. The President has authorized the Attorney General of the United States to approve applications for electronic surveillance and physical search for foreign intelligence purposes, 50 U.S.C. § 1805(a)(1) and § 1824(a)(1);
2. The motion has been made by a Federal officer and approved by the Attorney General, 50 U.S.C. § 1805(a)(2) and § 1824(a)(2);
3. The proposed minimization procedures entitled Intelligence Sharing Procedures for Foreign Intelligence and Foreign Counterintelligence Investigations Conducted by the FBI as modified herein, meet the definition of minimization procedures under § 1801(h) and § 1821(4) of the Act, 50 U.S.C. § 1805(a)(4) and § 1824(a)(4).
WHEREFORE, IT IS ORDERED,
A. The aforementioned minimization procedures are herewith modified, pursuant to this Court's authority under 50 U.S.C. § 1805(a) and (c) and 50 U.S.C. § 1824(a) and (c), to delete the second, third, and fourth paragraphs from Section I of the proposed minimization procedures. A revised statement of "General Principles" that is not inconsistent with the Court's opinion may be included in the Attorney General's memorandum.
B. The aforementioned minimization procedures are further modified, pursuant to this Court's authority under 50 U.S.C. § 1805(a) and (c) and 50 U.S.C. § 1824(a) and (c), to delete the second and third paragraphs from Section II. B and substitute the following paragraphs in place thereof:
"The FBI, the Criminal Division, and OIPR may consult with each other to coordinate their efforts to investigate or protect against foreign attack or other grave hostile acts, sabotage, international terrorism, or clandestine intelligence activities by foreign powers or their agents. Such consultations and coordination may address, among other things, exchanging information already acquired; identifying categories of information needed and being sought; preventing either investigation or interest from obstructing or hindering the other; compromise of either investigation; and long term objectives and overall strategy of both investigations in order to ensure that the overlapping intelligence and criminal interests of the United States are both achieved. Such consultations and coordination may be conducted directly between the components; however, OIPR shall be invited to all such consultations, and if they are unable to attend, OIPR shall be apprized of the substance of the meetings forthwith in writing so that the Court may be notified at the earliest opportunity."
"Notwithstanding the foregoing, law enforcement officials shall not make recommendations to intelligence officials concerning the initiation, operation, continuation or expansion of FISA searches or surveillances. Additionally, the FBI and the Criminal Division shall ensure that law enforcement officials do not direct or control the use of the FISA procedures *627 to enhance criminal prosecution, and that advice intended to preserve the option of a criminal prosecution does not inadvertently result in the Criminal Division's directing or controlling the investigation using FISA searches and surveillances toward law enforcement objectives."
C. Use of the aforementioned minimization procedures as modified, in all future electronic surveillances and physical searches shall be subject to the approval of the Court in each electronic surveillance and physical search where their use is proposed by the Government pursuant to 50 U.S.C. § 1804(a)(5) and § 1823(a)(5).
WHEREFORE, IT IS FURTHER ORDERED, pursuant to the authority conferred on this Court by the Foreign Intelligence Surveillance Act, that the motion of the United States to use the aforementioned minimization procedures as modified, in all electronic surveillances and physical searches already approved by the Court, as described in the Government's motion, is GRANTED AS MODIFIED herein.
A separate Memorandum Opinion has been filed this date. The motion of the United States has been considered by all of the judges of this Court, all of whom concur in the Memorandum Opinion and in the Order. The Court has also adopted a new administrative rule to monitor compliance with this Order as follows:

Rule 11, Criminal Investigations in FISA Cases
All FISA applications shall include informative descriptions of any ongoing criminal investigations of FISA targets, as well as the substance of any consultations between the FBI and criminal prosecutors at the Department of Justice or a United States Attorney's Office.
All seven judges of the Court concur in this Amended Order.
NOTES
[1] On April 17, 2002 the Government filed a supplemental memorandum of law in support of its March 7, 2002 motion. The supplemental memorandum misapprehends the issue that is before the Court. That issue is whether the FISA authorizes electronic surveillances and physical searches primarily for law enforcement purposes so long as the Government also has "a significant" foreign intelligence purpose. The Court is not persuaded by the supplemental memorandum, and its decision is not based on the issue of its jurisdiction but on the interpretation of minimization procedures.
[2] The Attorney General's memorandum of March 6, 2002 asserts its interpretation of the recent amendments to the FISA to mean that the Act can now "be used primarily for a law enforcement purpose, so long as a significant foreign intelligence purpose remains." The government supports this argument with a lengthy memorandum of law which we have considered. However, the Court has decided this matter by applying the FISA's standards for minimization procedures defined in § 1801(h) and § 1821(4) of the Act, and does not reach the question of whether the FISA may be used primarily for law enforcement purposes. We leave this question for another day.
[3] Cheng Fan Kwok v. Immigration and Naturalization Service, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968).
[4] Sections § 1801(h)(3) and § 1821(4)(C) require that the minimization procedures must *allow retention and dissemination of evidence of a crime which has been, is being, or is about to be committed. Such crimes are not related to the target's intelligence or terrorist activities, and the information would have to be discarded otherwise because it is not necessary to produce foreign intelligence information. Such retention and dissemination is not relevant to the issues considered in this opinion. Foreign Intelligence Surveillance Act of 1978, H.R. 7308, 95th Congress, 2nd Session, Report 95-1283, Pt.1, p. 62.
[5] Id. at 59.
[6] Id at 78.
[7] Id. at 80.